Jackson v. State.

\* JACKSON v. STATE.

(*Jackson.*   June 6, 1891.)

1. MURDER.   *Facts that support verdict for murder in first degree.*

   This Court affirms judgment for murder in first degree with sentence of death, upon the facts stated in the opinion.

2. CRIMINAL PRACTICE.   *Attorney-general not compelled to call all his witnesses.*

   The defendant in a criminal case has no right to have the Attorney-general call and examine all the witnesses whose names are indorsed upon the indictment.

3. SAME.   *Charge of Court.   Requests.*

   When the law applicable to the facts has been correctly charged, and this Court is satisfied with the verdict upon the facts, a criminal case will not be reversed, because the Court gave erroneous instructions which were not applicable to any facts proved, and refused to give other instructions upon defendant's request, which, though correct, were not applicable to the case.

FROM SHELBY.

Appeal in error from Criminal Court of Shelby County.   J. J. DUBOSE, J.

A. H. DOUGLASS for Jackson.

\* Death sentence, commuted by the Governor to imprisonment for life.—REPORTER.

Attorney-general PICKLE for State.

LEA, J.   On December 31, 1889, the plaintiff
in error shot and killed R. T. Myrick in Shelby
County.   He was tried in the Criminal Court of
Shelby County, convicted of murder in the first
degree, and has appealed to this Court.

F. A. Myrick and W. A. Myrick—brothers—
were farmers, living on the same tract of land,
but in different houses.   They had several tenants.
The Jacksons were living on their farm about one
and one-quarter miles from them.   The Myricks
had rented a portion of their land to Luther Hill
and Sam Tilghman, and they had sub-rented about
twenty acres to Tom Jackson, the father of the
defendant.   The proof is conflicting as to whether
the father or father and son rented the land, but
the weight of proof is that the father—Tom Jack-
son—rented the place, and that he and the defend-
ant were to work it, together with a small brother
and sister of the defendant.   The rent to be paid
was one-half of crop, and the Myricks were to
furnish supplies.   Hill and Tilghman had not paid
the rent to the Myricks, nor had the supply bill
been paid by the Jacksons.   On Friday or Satur-
day, December 27 or 28, before the killing on
Tuesday, the Myrick brothers went on a visit to
Colliersville, and returned on the night of the
thirtieth.   On the twenty-seventh the defendant
went to Memphis and swore out an attachment
against the property of his father, alleging he was

indebted to him in the sum of $100, due by note
for work and labor done.    On the twenty-eighth
the attachment was levied upon the cotton and
corn of Tom Jackson, and trial set for the thir-
tieth.    On the thirtieth Tom Jackson confessed
judgment, and waived notice, agreeing to an in-
stanter sale of the property attached.

On the morning of the thirty-first W. A. My-
rick took his gun and bird-dog and started over
to show a tenant where to build a house, and
went by his brother's, who went with him, taking
his gun.    They passed by and told Hill and Tilgh-
man to take the wagon over and haul the cotton
from Tom Jackson's field to the gin.    Jackson hav-
ing no wagon, the Myricks hauled his cotton
from the field to the gin.    This was early in the
morning.    They went to Britton's and directed him
where to put his house.    Britton lived in an op-
posite direction from Jackson's.    They, after hunt-
ing through the fields and woods, went in the di-
rection of Jackson's house, when the wagon came
along, and Hill and Henry Wade were in the
wagon and Sam Tilghman was walking; and, see-
ing no cotton in the field, they went on to the
house of Tom Jackson, where they arrived between
ten and twelve o'clock A.M.    Hill and Tilghman
were not informed of the attachment of the cot-
ton by the officer, but Tilghman had heard some
rumor of it; and, as he went on with the My-
ricks that morning in the direction of Jackson's,
told them that he had heard that Jackson had

attached his cotton. Myrick inquired of him: "What in the world would he attach his own crop for? That is only some talk among you colored people." The proof does not show that the Myricks knew of or had heard of any attachment other than as above stated. On the twenty-ninth the cotton had been hauled from the field to the house of Jackson, by order of the officer, and placed in one of the rooms, and one John Johnson placed in charge of it. The house in which Jackson lived consisted of two log rooms, and a hall between the rooms. There was only one door in each room, which opened into the hall; there was a small window in the family room; there was one or two blocks used as steps up to the hall, the floor of which was about eighteen inches above the ground. When about three or four hundred yards from the house of Johnson, the Myricks met a little sister of the defendant with a note to the Myrick brothers. She stated that she had started to their house with the note. It was a note from Thomas Jackson, written by the defendant. The note was:

"DECEMBER 31, 1889.
"*Mr. Myrick and Brother:*

"SIRS—Please send down and get your twenty bushels of corn; the balance is expecting to be sold.       THOMAS JACKSON."

R. T. Myrick, W. A. Myrick, and Sam Tilghman went on up in the yard. Thomas Jackson and John Johnson alone were standing in the hall.

R. T. Myrick's shoe being unfastened, he placed his foot upon a log or block and was in the act of tying his shoe, and after the salutation of "good morning," either by Myrick or Tom Jackson, Myrick inquired "where the cotton was that had been picked before we went to Collierville; we thought we would come down and get every thing straight."

The old man pointed to one of the rooms, and remarked, "All right;" and W. A. Myrick and Tilghman say, just at this time, while R. T. Myrick was thus bending, having his gun on his lap, pointing out to the side, the defendant poked his gun through the door, only partly opened, and fired, and R. T. Myrick fell dead with his head toward the hall and his gun under his body, or rather under his legs; some of the witnesses say with one hand on the stock of the gun, some say with neither hand on it.

The witness, W. A. Myrick, was then shot by the defendant through a hole under the window, which was shut, and his jaw-bone broken, and one eye put out, and was badly wounded about the throat. Myrick and Tilghman then left, as did Hill and Wade and one Thomas, who left just before the shooting commenced. Hill and Wade, who were with the wagon, did not get nearer than sixty or seventy yards of the house. Myrick was shot with a shotgun loaded with buckshot, and so was W. A. Myrick. The gun which the deceased had with him was a breech-loading gun. It is

conceded by all the parties present that deceased was shot in the forehead and killed at once; that he fell forward on his stomach and died without a struggle. It is important, to correctly determine this case, that we take the statement of all the witnesses to the shooting. We have given the statement of W. A. Myrick. Sam Tilghman, a colored man, says: "As we walked to the door, old man Jackson and John Johnson were standing in the gallery, and Mr. Myrick said, 'Jackson, where is that cotton?' Jackson said, 'It is in the house,' and by the time he said that, Andrew Jackson said, 'Is you come to haul it?' and pulled down on Mr. Myrick. He shot out of the door, which was partly open. At the time he was shot he was standing with his foot upon a block, and his gun was lying across his arm, the muzzle not in the direction of the house."

Luther Hill, another colored man, says he was with the wagon about sixty yards from the house when he saw the shooting. "When they got nearly to the house it looked to me Mr. Dick Myrick stopped and tied his shoe, and he had his gun across his lap, and it was not any time before he was shot; could not see Andrew Jackson or his gun; saw the smoke come out of the gallery. When Mr. Myrick walked up to the house he had his gun across his arm, the muzzle pointing out sideways, and was shot with the gun in this position."

Andrew Jackson, the defendant, testified that

26—6 r

the gun was loaded, one barrel with squirrel shot and the other with turkey shot. He had come home from hunting turkey about ten o'clock, and laid his gun on the bed. He said: "I was in the room; heard Mr. Dick Myrick say, 'Where is that cotton?' and my father said, 'It is here in the room;' and then I heard Mr. Myrick say, 'I will have that cotton or kill every one in the house.' I stepped out and asked him what he said; he did not answer me, but cocked his right-hand barrel, and made a motion toward me, and I stepped in the house and got my gun and shot him; and his brother stooped, as though he was going to shoot, and I shot him through the window." He says his father and John Johnson were in the gallery when he shot. He said he "did not care for the cotton, he only desired to protect himself."

John Johnson, a colored man, says he and Tom Jackson went out into the gallery, and saw the Myricks, Sam Tilghman, and Jackson's little daughter approaching when they were fifty or sixty yards away. Andrew Jackson and his little brother were in the room. Mr. Myrick stood near the step; there was a dog-block out in the yard; he came and set his foot on it and said, "'Where is that cotton that was in the field?'—talking to old man Jackson. The old man says, 'Here it is in the house.' Mr. Dick Myrick says, 'Well, I came after it, and I am going to have it or kill every thing on the place.' Andrew Jackson said, 'You

are going to have it, are you?' and stepped back and got his gun, and came up, and both had their guns up, and Myrick was shot. Andrew went into the room and shot W. A. Myrick. Mr. R. T. Myrick made no effort to shoot me or Tom Jackson." Upon cross-examination, he said and repeated that R. T. Myrick could not see Andrew Jackson when he was shot, and that when Andrew fired Mr. Myrick was talking to old man Jackson.

Tom Jackson, the father of defendant, said he and John Johnson were in the gallery when the deceased came up, and he said: "'Good morning,' and Mr. Dick Myrick said, 'Where is that cotton that was in the field?' He pointed to the room and said, 'You are welcome to it.' Andrew then came to the door and said: 'What did you say, Mr. Myrick?' and Mr. Myrick said: 'I am going to have that cotton or kill every one on the place.' Andrew whirled into the house, and came out with his gun, and they had their guns up just so, and I did not know which was shot until I saw Mr. Myrick fall." On cross-examination, he says he "tried to run into the room, but could not get in, for Andrew was in the way."

Walter Jackson, the thirteen-year-old brother of the defendant, said he was in the room when he heard Mr. Dick Myrick say: "'Where is that cotton that was in the field?' and my father says, 'Here, in the house,' and Mr. Myrick says, 'I am going to have that cotton or kill every thing on

the place;' his brother then stepped to the door
and said, 'What is that, Mr. Myrick?' He then
got his gun and shot him, and he fell forward."
He says his little sister, eleven years old, was be-
hind the door and under the bed; but she comes
upon the witness-stand and makes the same state-
ment which he does, only she denies that she was
behind the door or under the bed, but says both
she and her brother were in the door with An-
drew when he shot. She says Andrew said:
"'What is that, Mr. Myrick?' and reached back
and got his gun and shot Mr. Dick Myrick."

These are the statements of all the witnesses
who were present at the killing, and, although
inconsistent and contradictory, it clearly appears
that the killing was not in defense, as has been
argued, of his father and brother and sister; and
it further appears that, whatever may have been
the threat of the deceased in removing the cotton,
yet at the time of the killing he was making no
effort to remove it; in fact, had not yet reached
the house, and the wagon was fifty or sixty yards
from the house. It seems that there was no ob-
jection to his taking the cotton, for Tom Jackson
said he told him he was welcome to it; and de-
fendant says he "cared nothing about the cotton,
and deceased was not killed on that account."

Now, as to how the killing occurred. The state-
ment of witnesses of the State is, that when Mr.
Myrick approached near the door that he put his
foot on a block and bent down as if tying his

shoe, with his gun across his arm—the muzzle pointing in a different direction from the hall, or from the house—and in this position he was shot. Defendant's witnesses say he was in the act of shooting the defendant when shot; some say his gun was cocked, and nearly all say he had his gun pointing to the defendant. There are facts and circumstances which will show how these things were. The block upon which the witnesses say the deceased put his foot to tie his shoe was, by witnesses who attended the inquest, found under his body. It is testified to by all the witnesses that the deceased fell forward and died at once, and that the gun was under his legs, and the muzzle not in the direction of the house. It is also shown by all the reliable testimony that the gun which Myrick had was not cocked when found. Now, these facts and circumstances show that the gun of Myrick was not cocked, as stated by defendant, and that at the time he was shot he did not have his gun up to shoot, else it would have been cocked, and the position of the gun shows that it was not raised to shoot, and was not pointing in the direction of the house. And thus it appears that the statements of the State's witnesses as to the manner of killing were correct. Both of the Myricks were shot with buckshot, as testified by the attending physician, and the gun had evidently been prepared for that purpose, and was on the bed near the door. If he had said to Myrick that the cotton had been attached, and then Myrick

had commenced to move it, and the defendant, in defense of it, had killed, different questions might be presented, though he was not the owner of the cotton and the same was not left in his possession. It is unnecessary for us to state any conclusions from the fact the note was written to the Myricks to come after corn that morning, or the further fact that the father, as proved by a witness, when he saw them at a distance, commenced walking the room, wringing his hands, and moaning. Suffice it to say, we think, upon a careful examination of this voluminous record, the verdict of the jury is sustained by the evidence.

There was no error in the action of the Court in the selection of the jury, nor was it error because the Attorney-general was not compelled to call all the witnesses whose names were marked on the indictment; but it is earnestly insisted that there was error in the charge of the Court, and in the failure to charge requests upon the right of a party to protect his family from violence, or to protect his property from a trespasser. It is sufficient to say, if there be error in the charge of the Court, or error in the refusal to grant requests to charge upon these questions, it was wholly immaterial and does not affect the case, as there was no evidence tending to raise these questions. The law applicable to the facts of this case has been fully and correctly charged, and we find no error therein, and the judgment is affirmed.